**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**ERNEST BERG,
Administrator of the Estate
of Deceased Jeremy D. Berg,**

> ELECTRONICALLY
> FILED
> 3/21/2024
> U.S. DISTRICT COURT
> Northern District of WV

       **Plaintiff,**

**v.**                           **Civil Action No.** 2:24-CV-4 Kleeh

**LUCAS GREENWALT,
individually and in his capacity
as an employee of the Grant
County Sheriff's Department, and
GRANT COUNTY COMMISSION,
a political subdivision of the State of West Virginia,**

       **Defendants.**

## COMPLAINT

NOW COMES Ernest Berg, Plaintiff, as Administrator and personal representative of the Estate of Jeremy D. Berg, deceased, by counsel, J. Bryan Edwards, Esq., of the law firm of Cranston & Edwards, PLLC, and Traci M. Cook and Kelly R. Reed of the Law Offices of Kelly R. Reed PLLC, upon information and belief, and states and alleges as follows for his Complaint against Defendant, Lucas Greenwalt, individually and in his official capacity as a deputy employed by the Grant County Sheriff's Department and Defendant, Grant County Commission:

### I.  NATURE OF THE CAUSE OF ACTION

This Complaint, brought pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution, seeks compensatory and punitive damages from Defendants for violating various rights under the United States Constitution and state law in connection with the fatal shooting of Jeremy D. Berg, by Defendant, Lucas

Greenwalt, in his capacity as a duly-certified law enforcement officer employed by the Grant County Sheriff's Department on or about April 1, 2022, at the Justamere Road intersection with Route 220 in Hardy County, West Virginia, within the Northern District of West Virginia.

Further, the Grant County Commission's, either directly or through its law enforcement agency of the Grant County Sheriff's Department, failure to train Defendant Lucas Greenwalt on its policies and procedures resulted in the fatal shooting of Jeremy D. Berg by Defendant Lucas Greenwalt on or about April 1, 2022.

Further, the Grant County Commission's, either directly or through its law enforcement agency of the Grant County Sheriff's Department, knowingly, wantonly, and intentionally failed to preserve failed to preserve necessary evidence in this cause of action.

## II.    <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 to adjudicate pendent claims arising under the laws of the State of West Virginia.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the causes of action occurred within the Northern District of West Virginia.

## III.    <u>PARTIES</u>

3.      The Plaintiff, Ernest Berg, is the father of Decedent, Jeremy D. Berg, and duly appointed Administrator of the Estate of Jeremy D. Berg, having been duly appointed by the County Commission in and for the County of Grant, in the State of West Virginia,

on April 4, 2022. (See "Letter of Administration" attached hereto as Exhibit A.)  As Administrator, Plaintiff, Ernest D. Berg, is the personal representative of the Decedent, Jeremy D. Berg, and is authorized by West Virginia law to bring this action.

4.      The Plaintiff, Ernest Berg, is and was at all times relevant hereto a resident of Maysville, Grant County, West Virginia, within the Northern District of West Virginia.

5.      At the time of his death, the Decedent, Jeremy D. Berg (hereinafter "Decedent Berg"), was a resident of Grant County, West Virginia.

6.      Defendant Lucas Greenwalt (hereinafter "Defendant Greenwalt") is and was at all times relevant hereto, a resident of Petersburg, Grant County, West Virginia.

7.      Defendant Greenwalt was at all times relevant hereto employed by the Grant County Sheriff's Department as a duly appointed and sworn police officer and was acting in his individual capacity and/or under color of state law and within the scope of his employment. He is named in his individual capacity and as an employee Grant County Sheriff's Department.

8.      Defendant Grant County Commission (hereinafter "Defendant GCC") is a political subdivision of the State of West Virginia, and as such, is liable for the negligent conduct of its agents and employees, including the Sheriff, the Sheriff's Department, and the employees of the Sheriff's Department, so long as that conduct was carried out within the scope of their employment. *See* West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1, *et seq*.

9.      At all times relevant herein, Defendant GCC oversaw and operated the Grant County Sheriff's Department, which employed Defendant Greenwalt in this case.

10.    At all times relevant herein, Defendant Greenwalt was an employee, agent, and/or other representative of the Grant County Sheriff's Department.

11.    At all times relevant herein, the acts and omissions of the Defendant GCC were pursuant to the customs, policies, practices, training, and/or procedures of the County Commission of Grant County, via its law enforcement entity, the Grant County Sheriff's Department, and its policymaker(s).

12.    The conduct alleged herein to have been committed by an employee, agent, and/or other representative of Defendant GCC is hereby alleged to have been committed by said employee, agent, and/or other representative in the scope of his employment and authority.  The causes of action asserted herein against Defendant GCC, refer to the failure to train the employee, agent, and/or other representative of said Defendant political subdivision, either directly or via  its  law  enforcement  entity, pursuant to its policies, rather than the formulation and implementation of policy related to how law enforcement and police protection are provided.

13.    At all times relevant herein, Defendant GCC, either directly or via  its  law enforcement  entity, the  Grant  County  Sheriff's  Department, maintained, monitored, and supervised a video surveillance camera system and its recorded video footage at the Grant County Courthouse, including the Grant County Courthouse annex.

## IV.    FACTS

### The Grant County Sheriff Department's
### Prisoner Transportation Operational Policy and Procedure

14.    The Grant County Sheriff Department's (hereinafter GCSD) Prisoner Transportation Operational Policy and Procedure "is to establish procedures to ensure that prisoners/persons in custody are controlled in ways that will protect their safety, the

safety of the public, and the safety of involved officers during transport, processing and delivery to a Court or correctional facility." *See* GCSD Prisoner Transportation Operational Policy and Procedure at 1 (attached hereto as "Exhibit B").

15.     The GCSD's Prisoner Transportation Operational Policy and Procedure requires all prisoners/persons in custody to be handcuffed during transport with the handcuffs double-locked, "except when the prisoner or the surrounding circumstances and/or officer safety issues reasonably prevent double locking." *Id*. at 2.

16.     Pursuant to the GCSD's Prisoner Transportation Operational Policy and Procedure, "[h]andcuffing a prisoner with their hands to the front, or use of other appropriate restraining devices *may* be used where the prisoner:

a.  Is in an obvious state of pregnancy.

b.  Has a physical handicap.

c.  Has injuries that could be aggravated by standard handcuffing procedures.

*Id*.

17.     The GCSD's Prisoner Transportation Operational Policy and Procedure further requires "[a]ll prisoners shall be secured in a cruiser by proper use of a seat belt unless extraordinary circumstances require transport without seat belts in place." *Id*. at 3.

18.     The GCSD's Prisoner Transportation Operational Policy and Procedure further mandates, "[m]embers shall not engage in enforcement activities while transporting prisoners unless failure to act would risk death or serious bodily injury to another person.  In non-life threatening, yet serious situations, members should

call for back-up assistance and may remain on-hand until such assistance has arrived." *Id*. at 3.

**The Grant County Sheriff Department's
Use of Force Policy**

19.     The GCSD's Use of Force Policy expects its deputies to "[e]mploy the minimum force reasonably necessary to accomplish a legal purpose."  *See* GCSD Use of Force Policy at 3 (attached hereto as "Exhibit C").

20.     The GCSD's Use of Force Policy provides that a deputy sheriff's escalation of force, from mere verbal directions to empty hand control to intermediate weapons to the use of lethal force, "may include only that which is required to properly respond to the particular circumstances of each situation." *See* Id. at 2-3.

21.     The GCSD's Use of Force Policy restricts the use of the Taser Model X-2 to situations where lesser levels of force, including verbal commands, empty hand/compliance techniques, impact weapons, or chemical weapons, are "ineffective or inappropriate" and a higher level of force is necessary.  *Id*. at 10.

22.     Per the GCSD's Use of Force Policy, prohibits officers from drawing or displaying a firearm "unless there is a threat or a reasonable suspicion to believe that there exists a threat to human life" or shooting 'except to protect themselves or other persons from the threat of immediate death or serious bodily injury." *Id*. at 12.

23.     The GCSD's Use of Force Policy defines "Excessive Force" as "[f]orce is excessive when its application is inappropriate to the circumstances[.]" *Id*. at 2-3.

24.     The GCSD's Use of Force Policy warns that the "unnecessary or premature drawing or exhibiting of a firearm limits an officer's alternatives in

controlling a situation, creates high levels of anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm." *Id*.

25.    The GCSD's Use of Force Policy provides that "[f]irearms may only be used:

    a.    In defense of the officer or other from what is reasonably believed to be an immediate threat of death or serious bodily harm; or

    b.    To prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should the escape occur . . .

    c.    To kill a seriously injured or dangerous animal when no other disposition is reasonably practical and available . . .

    d.    During regular and routine firearms training or practice at an approved shooting range."

*Id*. at 10.

### The Grant County Sheriff Department's
### Guidelines on Deployment and Proper Protocols on the X-2 Taser

26.    The GCSD utilizes the Taser Model X-2 as "the approved less than lethal weaponry" for the department. *See Id*. GCSD Use of Force Policy at 10.

27.    The GCSD's Guidelines on Deployment and Proper Protocols on the X-2 Taser authorizes the application of a taser "only when circumstances known to the individual officer at the time indicate that the application of the Taser is reasonable to subdue to control:

    a.  a person who the officer reasonably believes creates an immediate, credible threat to the physical safety of himself/herself, the officer, or another person; or

    b.  a person who engages in, or displays the intent to engage in, aggressive physical resistance to a lawful police action; or

    c.  a person who has been placed under arrest or is so advised but engages in active physical resistance exceeding officers' ability to control him/her using strength or control holds. A Taser may be used to gain control of such a person in lieu of engaging in a struggle with him/her that would risk greater injury to the subject or officers than use of the Taser, or

    d.  a person who flees from arrest for a crime for which a person would normally be taken into custody[.]"

*See* GCSD's Guidelines on Deployment and Proper Protocols on the X-2 Taser at 2 (attached hereto as "Exhibit D").

28.     The GCSD's Guidelines on Deployment and Proper Protocols on the X-2 Taser prohibits use of the X-2 Taser "on individuals who are handcuffed or otherwise restrained, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion." *See Id*. at 3.

29.     "The use of the Taser must comply with other relevant department policies, including those involving use of force." *Id*. at 1.

**Jeremy D. Berg**

30.     Decedent, Jeremy D. Berg, was born on July 6, 1978, and was 43 years old at the time of his death.

31.    On or about September 30, 1994, Decedent Berg, then 16 years old, suffered a traumatic brain injury, as well as multiple pelvic fractures, a splenic laceration, and multiple contusions, after being ejected from a vehicle in which he was a passenger.

32.    Decedent Berg continued to suffer from the effects of the traumatic brain injury throughout his life, including cognitive deficits and bi-polar disorder for which he was prescribed medication.

33.    Upon information and belief, Decedent Berg also continued to suffer from physical limitations due to the accident at the time he was shot, including a right-sided foot drop from nerve damage and the inability to walk fast or run.

**The Grant County Sheriff's Office Arrest of Decedent Berg**

34.    Upon information and belief, on March 31, 2022, in Grant County, West Virginia, at approximately 6:00 p.m., Decedent Berg drove his car from his home to McGuiness Self Service, a convenience store and self-serve gas station located at 4729 Jordan Run Road, Maysville, WV, to purchase a sandwich and a pen knife.

35.    Upon information and belief, Decedent Berg sat in his car in the store parking lot for a few minutes after the purchase and then drove his car onto property located across the street from the store.

36.    Pursuant to Grant County E-911 recordings, at approximately 6:32 p.m., Michael McGuiness, owner of McGuiness Self Service, as well as the owner of the land across the street upon which Decedent Berg drove, contacted Grant County E-911 to have Decedent Berg removed from the property, reporting that Decedent Berg should not be on the property and he could hear Decedent Berg spinning his tires.

37.    At approximately 6:34 p.m., Grant County E-911 dispatched Defendant Greenwalt to the McGuiness property to remove Decedent Berg. Defendant Greenwalt advised he was familiar with Decedent Berg.

38.    At approximately 6:50 p.m. and while still enroute to Decedent Berg's location, Defendant Greenwalt advised Grant County E-911 that he would arrest Decedent Berg "again."

39.    At approximately 6:52 p.m., Defendant Greenwalt met Mr. McGuiness' brother-in-law, S.R., at the McGuinness Store parking lot and followed him onto Mr. McGuiness' property to locate Decedent Berg.

40.    Defendant Greenwalt reported that S.R. and his wife advised that they attempted to speak with Decedent Berg prior to the deputy's arrival and request Decedent Berg to leave, but Decedent Berg ignored S.R., was shaking something in his hand that appeared to be a knife, and acted like he may be under the influence of something. *See* Criminal Complaint (redacted) at 3 (attached hereto as "Exhibit E")

41.    Pursuant to Grant County E-911 recordings and upon information and belief, approximately 20 minutes thereafter, Defendant Greenwalt encountered Decedent Berg on a neighboring property while Decedent Berg was speaking with the owner of the property.

42.    Upon information and belief, Decedent Berg apologized to Mr. McGuiness' brother-in-law for any problems he may have caused.

43.    Defendant Greenwalt claims that upon contact with Decedent Berg, Decedent Berg did not know why he was trespassing and could not recall any encounter with S.R. *See* Id.

44.     Upon information and belief, Decedent Berg told Defendant Greenwalt that he had taken his prescribed medicine that day and had used methamphetamine a few days prior.  *See* Id.

45.     Defendant Greenwalt claims he believed Decedent Berg exhibited signs that he was under the influence and Defendant Greenwalt administered field sobriety tests and a preliminary breath test to Decedent Berg. *See* Id.

46.     Upon information and belief, Decedent Berg registered a .000 on the preliminary breath test. *See* Id.

47.     Defendant Greenwalt claims that Decedent Berg failed the field sobriety tests. *See* Id.

48.     Pursuant to Grant County E-911 recordings, on March 31, 2022, at approximately 7:30 p.m., in Grant County, West Virginia, Defendant Greenwalt, a sheriff's deputy employed by Defendant GCC, placed Decedent Berg under arrest for the misdemeanor offense Driving Under the Influence.

49.     Upon the arrest, Defendant Greenwalt claimed that Decedent Berg became aggressive and hostile, claimed Decedent Berg threatened to kill Defendant Greenwalt. *See* Id. at 3-4.

50.     Defendant Greenwalt transported Decedent Berg to the GCSD's holding cell in the Grant County Courthouse Annex (hereinafter "Annex" or "GCSD's Annex"), located in Petersburg, Grant County, West Virginia, for processing following the arrest. *See* Id at 4.

51.     Upon information and belief, Decedent Berg was transported to GCSD's holding cell in the Grant County Courthouse Annex while handcuffs were applied with decedent's hands behind his back.



52.     During transport, Defendant Greenwalt claimed Decedent Berg further threatened to kill Defendant Greenwalt "by ripping [his] eye balls out of any [sic] head and then torture [him] to death."   *See Id.*

**Grant County Sheriff Department's Annex and Video Surveillance**

53.     The Annex is equipped with multiple video surveillance cameras monitoring various locations throughout the Annex.

54.     On April 22, 2022, Defendant GCC and the GCSD received letters on behalf of Plaintiff to preserve any and all evidence of the custody of Decedent Berg commencing in the evening hours of March 31, 2022, including video camera footage from the GCSD, Grant County Courthouse, and/or Grant County jail. *See* Preservation Letter and Confirmation of Facsimile, dated April 22, 2022 (attached hereto as "Exhibit F").

---

[1] Photo capture from Channel 7 of the GCSD's Annex video surveillance system of Decedent Berg walking to the holding cell at the Annex while handcuffed in the back just after his arrest.

55.     Thereafter, by Freedom of Information Act (hereinafter "FOIA") request and response thereto, dated August 10, 2022, and August 15, 2022, respectively, Plaintiff was provided copies of preserved video camera footage from four of the GCSD Annex's video surveillance cameras purporting to contain all of the video recordings at the Annex of the custody of Jeremy D. Berg on March 31, 2022, through April 1, 2022.  *See* August 10, 2022, FOIA Request and August 15, 2022 Response (attached hereto as "Exhibit G").

56.     In response to the FOIA request, the GCSD provided video surveillance camera recordings from the following channels that captured video recording of the custody of Decedent Berg at the Annex:

a. Channel 7, view of the interior hallway leading to the holding cell;

b. Channel 10, view of the holding cell;

c. Channel 11, partial view into the holding cell from a camera located in an adjacent room; and

d. Channel 14, view of the Annex parking lot.

57.     The video camera footage from the four GCSD Annex's video surveillance cameras provided in response to the FOIA request was missing substantial portions of the recordings of the custody of Decedent Berg, including, but not limited to one hour and sixteen minutes of missing video from Channel 10 (holding cell) of Decedent Berg's custody; approximately two hours of missing video from Channel 11 (partial view into the holding cell from a camera located in an adjacent room) of Decedent Berg's custody; final escort of Decedent Berg within the Annex from Channel 7 (interior hallway from holding cell) of Decedent Berg's custody; and multiple video recordings from Channel 14 (Annex parking lot) of Decedent Berg's custody.

58.     By letter response dated April 25, 2023, the GCSD failed to preserve all of the GDSD Annex's video surveillance camera footage of the custody of Jeremy D. Berg on March 31, 2022, and allowed the video recorded footage to deleted and recorded over after four months.

59.      The Plaintiff has not been provided any of the missing video footage from Channels 7, 10, 11, and 14.

60.     Upon information and belief, the GCSD failed to preserve all of the video camera footage from the GCSD Annex's video surveillance camera system of the custody of Decedent Berg on March 31, 2022, as requested per the preservation letter sent to Defendant GCC and GCSD on April 22, 2022, just twenty-two days after the event.

### Processing of Decedent Berg at the
### Grant County Sheriff Department's Annex

61.     At approximately 8:08 p.m. Defendant Greenwalt and Decedent Berg arrived at the GCSD's Annex.

62.     Per the video surveillance cameras, Decedent Berg was processed at the Annex from approximately 8:08 p.m. to approximately 9:02 p.m., at which time Defendant Greenwalt transported Decedent Berg from the Annex to Grant Memorial Hospital for a blood test.

63.     Based upon a FOIA request to the GCSD and response thereto, Defendant Greenwalt provided a statement pursuant to an internal investigation by the GCSD on April 19, 2022. *See* Transcript of Recorded Interview of Senior Deputy Lucas Greenwalt, dated April 19, 2022 (attached hereto as "Exhibit H").

64.     Defendant Greenwalt claims that upon arrival at the Annex, Decedent Berg refused to exit the police vehicle and was "talking out of his mind."

65.    The GCSD failed to produce any video surveillance recording of Decedent Berg exiting the police vehicle at the Annex pursuant to the FOIA request.

66.    Defendant Greenwalt claims that while at the Annex and prior to transport to Grant Memorial Hospital, Decedent Berg was demanding to be taken to his mother's home and claiming he was not under arrest.

67.    The GCSD failed to produce any video surveillance recording revealing Decedent Berg acting in any demanding manner.

68.    At approximately 9:02 p.m., Defendant Greenwalt and Decedent Berg left the Annex enroute to Grant Memorial Hospital.

69.    At approximately 9:08 p.m., Defendant Greenwalt and Decedent Berg arrived at the Emergency Department at Grant Memorial Hospital.

70.    Upon information and belief, Decedent Berg was transported to Grant Memorial Hospital while handcuffs were applied with decedent's hands behind his back.

[2]

---

[2] Photo capture from Channel 7 of Decedent Berg leaving the Annex for transport to Grant Memorial Hospital.  Photo capture from Grant Memorial Hospital video surveillance system of Decedent Berg arriving at the Emergency Department of Grant Memorial Hospital. The time-stamp on Grant Memorial Hospital's video surveillance system is inaccurate.



71.    Defendant Greenwalt claims that while transporting decedent to the hospital, Decedent Berg kicked at the cruiser door, threatened to torture and kill Defendant Greenwalt when the handcuffs were removed at the hospital.[4]

72.    Despite Defendant Greenwalt's claims that Decedent Berg was obstructive, threatening, and uncooperative post arrest, Defendant Greenwalt entered the Emergency Department at Grant Memorial Hospital approximately eight to ten feet in front of Decedent Berg.

73.    While at the Emergency Department of Grant Memorial Hospital, Defendant Greenwalt permitted Decedent Berg to wander away unaccompanied to read materials hanging on the wall.

---

[3] Photo capture from Grant Memorial Hospital video surveillance system of Decedent Berg arriving at the Emergency Department of Grant Memorial Hospital. The time-stamp on Grant Memorial Hospital's video surveillance system is inaccurate.

[4] On April 13, 2022, Defendant Greenwalt also provided a statement to the West Virginia State Police.



74.    While at the Emergency Department of Grant Memorial Hospital, Defendant Greenwalt re-applied handcuffs to decedent with Decedent Berg's hands in the front of his body.

75.    While at the Emergency Department of Grant Memorial Hospital and while Decedent Berg was handcuffed in front of his body, Defendant Greenwalt permitted Decedent Berg to wander away unaccompanied to read materials hanging on the wall.



---

[5] The time-stamp on Grant Memorial Hospital's video surveillance system is inaccurate.

[6] The time-stamp on Grant memorial Hospital's video surveillance system is inaccurate.

76.     While at the Emergency Department of Grant Memorial Hospital, Defendant Greenwalt walked several feet in front Decedent Berg to escort decedent for the blood test.



77.     Defendant Greenwalt claimed that while blood was being drawn, Decedent Berg was vulgar and belligerent.

78.     Approximately twenty-five minutes after arrival, Defendant Greenwalt and Decedent Berg left the Emergency Department of Grant Memorial Hospital to return to the Annex.

79.     Defendant Greenwalt walked several feet in front of Decedent Berg as the pair left Grant Memorial Hospital.

---

[7] The time-stamp on Grant Memorial Hospital's video surveillance system is inaccurate.



80.    Decedent Berg left Grant Memorial Hospital with his hands cuffed in front of his body.



81.    Upon information and belief, Decedent Berg was transported by Defendant Greenwalt from Grant Memorial Hospital to the Annex while handcuffs were applied with decedent's hands in the front of his body.

---

[8] The time-stamp on Grant memorial Hospital's video surveillance system is inaccurate.

[9] The time-stamp on Grant memorial Hospital's video surveillance system is inaccurate.

82.    Defendant Greenwalt claims that while transporting decedent from the hospital to the Annex, Decedent Berg again kicked at the cruiser door, was belligerent, and yelled.[10]

83.    At approximately 9:39 p.m., Defendant Greenwalt and Decedent Berg arrived back at the Annex.

84.    Decedent Berg arrived at the Annex with his hands cuffed in front of his body.


[11]

85.    Defendant Greenwalt claims that upon return to the Annex, Decedent Berg yelled a couple of times, requiring Defendant Greenwalt to check on Decedent Berg in the holding cell.

86.    The GCSD failed to produce any video surveillance recording of Decedent Berg yelling upon return to the holding cell or Defendant Greenwalt checking on Decedent Berg in the holding cell.

---

[10] April 13, 2022, statement by Defendant Greenwalt to the West Virginia State Police.

[11] Photo capture from Channel 7 of Decedent Berg arriving at the Annex after transport from Grant Memorial Hospital.

87.    Per Channel 11 of the Annex's video surveillance recording, Defendant Greenwalt entered the holding cell containing Decedent Berg at approximately 11:40 p.m. for the final time before transporting Decedent Berg to the regional jail.



88.    Defendant Greenwalt claims that upon entering the holding cell, he advised Decedent Berg of the charges of Driving Under the Influence and Obstructing and advised Decedent Berg that he would be transported to the jail.

89.    Defendant Greenwalt claims that Decedent Berg then threatened that Defendant would be a "dead man" when Decedent Berg was released from jail and offered Defendant Greenwalt a "Mason" coin that Defendant Greenwalt had to accept and allow Decedent Berg to "walk free."

90.    Defendant Greenwalt claims that Decedent Berg then refused to be fingerprinted.

91.    Defendant Greenwalt claims that he then agreed to handcuff Decedent Berg with decedent's hands in front after Decedent promised to be polite during transport.[13]

---

[12] Photo capture from Channel 11 of Defendant Greenwalt entering the holding cell.

[13] April 13, 2022, statement by Defendant Greenwalt to the West Virginia State Police.

92.     Defendant Greenwalt also claims that he agreed to handcuff Decedent Berg with decedent's hands in front to be nice.

93.     Defendant Greenwalt claims that he warned decedent that he (defendant) would pull over and move the handcuffs to the rear, using only one set of handcuffs so as not make it more comfortable for decedent, the first-time decedent caused any problems during transport.

94.     As indicated above, pursuant to the GCSD Prisoner Transportation Operational Policy and Procedure, handcuffing with hands to the front is only permitted where a prisoner is in an obvious state of pregnancy; has a physical handicap; or has injuries that could be aggravated by standard handcuffing procedures.

95.     Defendant Greenwalt claims that upon placing Decedent Berg in his vehicle, Decedent Berg refused to be seat belted in the vehicle.

96.     As indicated above, the GCSD's Prisoner Transportation Operational Policy and Procedure requires that all prisoners to be secured in a cruiser by the proper use of a seatbelt absent extraordinary circumstances.

97.     Upon information and belief, Defendant Greenwalt transported Decedent Berg in his police cruiser while Defendant Berg was handcuffed in front and not seat belted in the cruiser.

98.      When Defendant Greenwalt proceeded to transport Decedent Berg while decedent was handcuffed in the front, Defendant Greenwalt violated the GCSD's Prisoner Transportation Operational Policy and Procedure.

99.     When Defendant Greenwalt proceeded to transport Decedent Berg in the cruiser to the regional jail without a seatbelt and without reason not to do so, Defendant

Greenwalt again violated the GCSD's Prisoner Transportation Operational Policy and Procedure.

100.    At approximately 23:46, Defendant Greenwalt and Decedent Berg left the Annex in Defendant Greenwalt's GCSD issued vehicle enroute to the regional jail.



101.    The GCSD failed to produce any video surveillance recording from Channel 10, the holding cell, regarding any interaction between Defendant Greenwalt and Decedent Berg from the time Defendant Greenwalt entered the holding cell at 11:40 p.m. and Defendant Greenwalt's vehicle leaving the Annex at 11:45 p.m. pursuant to the FOIA request.  In fact, the last recording produced from Channel 10, the holding cell, was time-stamped 10:29:24 p.m. on March 31, 2022.

102.    The GCSD failed to produce any video surveillance recording from Channel 14, the Annex parking lot, regarding any interaction between Defendant Greenwalt and Decedent Berg while decedent was being placed in the vehicle.

---

[14] Photo capture from Channel 14 of Defendant Greenwalt's cruiser leaving the parking area of the Annex.

**Final Transport of Decedent Berg**

103.    Defendant Greenwalt claims that near the Sheetz convenience store and gas station in Moorefield, West Virginia, while enroute to the regional jail, Decedent Berg became belligerent, beat on the cage in the vehicle, and kicked the cage.

104.    Defendant Greenwalt neither stopped his vehicle nor called for backup assistance from another law enforcement officer nor radioed dispatch at the Grant County E-911 Center regarding Decedent Berg's alleged behavior.

105.    Defendant Greenwalt claims Decedent Berg's behavior then settled down.

106.    Defendant Greenwalt claims that approximately five miles later and near the Old Fields Country Store, Decedent Berg again became belligerent and was beating on the cage in the vehicle, yelling, cursing, threatening to kill Defendant Greenwalt, and spitting on Defendant Greenwalt.

107.     Upon information and belief, Defendant Greenwalt traveled approximately another five miles before radioing the Grant County E-911 Center at 12:15:04 a.m. on April 1, 2022, to advise he would be pulling over at Justamere Road.

108.    Justamere Road intersects with Route 220 in a remote location in Hardy County, West Virginia.

109.    Defendant Greenwalt claims that he pulled over at the Justamere Road intersection to remove Decedent Berg from the cruiser to place a spit mask on Decedent Berg and move Decedent Berg's handcuffs from the front to the rear.

110.    Per radio traffic, Defendant Greenwalt again radioed the Grant County E-911 Center at 12:15:22 a.m., advising of his location at Justamere Road and that he would be out of his vehicle.

111.    Defendant Greenwalt neither requested backup assistance nor advised dispatch at the Grant County E-911 Center of Decedent Berg's alleged behavior in either the 12:15:04 a.m. or 12:15:22 a.m. radio call.

112.    As indicated above, the GCSD's Prisoner Transportation Operational Policy and Procedure further prohibits "engagement in enforcement activities while transporting prisoners unless failure to act would risk death or serious bodily injury to another person.  In non-life threatening, yet serious situations, members should call for back-up assistance and may remain on-hand until such assistance has arrived."  *See* Exhibit B at 3.

113.    When Defendant Greenwalt stopped his cruiser while in transport of Decedent Berg to engage in law enforcement activity in a non-life-threatening situation and failed to call for back-up, Defendant Greenwalt again violated the GCSD's Prisoner Transportation Operational Policy and Procedure.

114.    At 12:17:16 a.m. on April 1, 2022, Defendant Greenwalt radioed the Grant County E-911 Center with "shots fired."

115.    According to radio traffic, Defendant Greenwalt did not respond to hails from the Grant County E-911 Center until 12:19:21, at which time Defendant Greenwalt radioed advising EMS was not necessary because, "suspect down."

**Shooting Death of Decedent Berg**

116.    Decedent Berg's death was pronounced on April 1, 2022.

117.    An autopsy of Decedent Berg revealed eight separate and distinct gunshot wounds, with six of the eight gunshots wounds entering Decedent Berg from the back and one of the eight gunshots wounds entering Decedent Berg from the rear left side of

the left leg and exiting the front of the leg. Decedent Berg died as a result of the multiple gunshot wounds that perforated and penetrated his torso and extremities.

118.    Decedent Berg's injuries from the foregoing eight gunshot wounds included, but were not limited to, a fractured right radius and humerus; severed right axillary artery, vein, and brachial plexus; perforation of the right and left lungs; lacerations and hemorrhages of the left side of the latissimus dorsi; fractures of the left scapula and left third and fourth ribs; perforation of multiple loops of the small intestines; multiple lacerations of the peritoneum, mesentery of the intestines, left side of the diaphragm and middle lobe of the left lung; facture of the first lumbar vertebra; several severed mesenteric arteries; laceration and hemorrhage of the left triceps and bicep muscles; perforation and multiple fractures of the left ilium; multiple lacerations of the liver; perforation of the sacral bone; multiple comminuted fractures in the left acetabulum of the pelvic bone and left head of the femur.

119.    Decedent Berg died as a result of the multiple gunshot wounds that perforated and penetrated his torso and extremities.

120.    On April 1, 2022, the West Virginia State Police, as well as numerous other law enforcement agencies, responded to Defendant Greenwalt's location at Justamere Road.

121.    The West Virginia State Police was assigned the investigation of the shooting death of Decedent Berg.

122.    Upon information and belief, all shootings are required to be investigated as a homicide until proven as such or ruled otherwise (i.e. suicide, self-defense, an otherwise justified shooting, etc).

123.    The West Virginia State Police initiated its Crime Scene Response Team (CSRT) to the location of the shooting at the Justamere Road intersection.

124.    The CSRT photographed the scene, sketched the scene, and collected physical evidence, including, but not limited to, the X-2 Taser, 2 taser probes with wire, 1 taser probe, 3 taser cartridge ends, 7 fired 45 auto casings, a ballistic vest with a taser probe, and a Glock 41 Gen 4 45 firearm and magazine with 5 live rounds.

125.    The CSRT unit failed to take any measurements at the scene of the shooting or in preparing and finalizing its sketch depicting of the shooting scene and evidence location.  *See* CSRT sketch (attached hereto as "Exhibit I").

126.    In addition to the aforementioned statement of Defendant Greenwalt pursuant to an internal investigation eighteen days after the shooting, Defendant Greenwalt also provided a recorded statement to the West Virginia State Police about the shooting death of Decedent Berg on April 1, 2022, on April 13, 2022, twelve days after the shooting.

127.    The West Virginia State Police did not investigate the subject shooting as a homicide.

128.    During the West Virginia State Police's interview of Defendant Greenwalt, the state police clarified the interview was about the death of Decedent Berg, but not about a crime.

129.    Defendant Greenwalt claims that after stopping at the Justamere Road intersection and upon opening Decedent Berg's door, that being the rear passenger side door of the police cruiser, Decedent Berg attempted to kick and hit Defendant Greenwalt and would not exit the car.

130.    Defendant Greenwalt claims that the foregoing attempted kicking occurred while Decedent Berg's feet remained in the foot well of the car.

131.    Defendant Greenwalt claims that after warning Decedent Berg that he [decedent] would be "dry stunned" with the GCSD issued taser and decedent failing to comply with further directions to exit the rear of the vehicle, Defendant Greenwalt drew his GCSD issued taser and activated the taser.

132.    Defendant Greenwalt claims that after drawing and activating his GCSD issued taser, Defendant Greenwalt again warned Decedent Berg to comply or receive a dry stun, to which Decedent Berg replied he would not be touched with the taser.

133.    Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

134.    Upon information and belief, when Defendant Greenwalt drew his X-2 Taser to use on Decedent Berg, Decedent Berg was not an immediate, credible threat to the physical safety of himself, Defendant Greenwalt, or any other person.

135.    Upon information and belief, when Defendant Greenwalt drew his X-2 Taser to use on Decedent Berg, Decedent Berg neither engaged in nor displayed an intent to engage in aggressive physical resistance to a lawful police action.

136.    Upon information and belief, when Defendant Greenwalt drew his X-2 Taser to use on Decedent Berg, Decedent Berg did not engage in any active physical resistance exceeding Defendant Greenwalt's ability to control using strength or control holds.

137.    Assuming, arguendo, that Defendant Greenwalt actually believed Decedent Berg, from a seated position in the back seat of a secured cruiser while handcuffed and his feet inside the vehicle, actually posed a threat of resistance exceeding Deputy

Greenwalt's ability to control by using strength or control holds, Defendant Greenwalt could have simply shut the door of the vehicle and called for back-up.

138.    Defendant Greenwalt claims that as he went to apply the taser for the dry stun, Decedent Berg disarmed Defendant Greenwalt of the taser and tased Defendant Greenwalt from the rear seat of the vehicle.

139.    Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

140.    Even if Defendant Greenwalt's claims are true, Defendant Greenwalt's use of the GCSD issued taser would have violate both the GCSD's Guidelines on Deployment and Proper Protocols on the X-2 Taser prohibiting use of the taser on handcuffed individuals and the GCSD's Use of Force Policy requiring employment of the minimum force reasonably necessary to respond properly to the situation.

141.    Defendant Greenwalt claims he received the full five second shock of the taser while "body rolling, sliding down the passenger side" of the police cruiser to the rear of the vehicle.

142.    Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

143.    Defendant Greenwalt claims that after the full five second shock of the taser, Defendant Greenwalt, while he was near the driver side taillight of the police cruiser, yelled at Decedent Berg, now positioned at the passenger side taillight of the police cruiser, to stop and instructed Decedent Berg to drop the taser.

144.    Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

145.   Defendant Greenwalt claims that after receiving the full five second shock of the taser, Decedent Berg, from a position at the passenger side taillight of the police cruiser, again deployed the taser and struck Defendant Greenwalt.

146.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

147.   Defendant Greenwalt claims he was drawing his GCSD issued Glock 41, Gen 4 pistol just as Decedent Berg tased him this second time, causing Defendant Greenwalt to shoot himself in the left forearm as he drew the Glock pistol.

148.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

149.   Defendant Greenwalt claims he again received the full five second shock of the taser during this event.

150.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

151.   Defendant Greenwalt claims that from the rear of the police cruiser, he shot his GCSD issued pistol two to three times at Decedent Berg.

152.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

153.   Defendant Greenwalt claims Decedent Berg yelled and jumped as if he were hit by the gunshots, started "back peddling around [Defendant's] car[,]" and Decedent Berg still had the taser in his hand and kept pulling the taser trigger like it was a firearm.

154.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

155.   Defendant Greenwalt claims that he continued to chase Decedent Berg around the car as Decedent Berg was "backing up" and still holding the taser up while it is crackling as if charged.

156.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

157.   Defendant Greenwalt claims that Decedent Berg backed into the rear passenger door of the vehicle that was still ajar, causing Decedent Berg to drop the taser.

158.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

159.   Defendant Greenwalt claims that Decedent Berg then spun around, ran "like in slow motion," and bent down to pick up the taser, when Defendant Greenwalt shot his GCSD issued pistol three to four more times at Decedent Berg.

160.   Upon information and belief, the physical evidence does not support Defendant Greenwalt's foregoing claim.

161.   Upon information and belief, when Defendant Greenwalt drew his Taser Model X-2, Decedent Berg, seated in a vehicle and handcuffed, did not pose an immediate threat to Defendant Greenwalt nor engaged in overtly assaultive behavior that could not have been reasonably dealt with by Defendant Greenwalt.

162.   Upon information and belief, when Defendant Greenwalt drew his Taser Model X-2, a lesser level of force, including, but not limited to verbal commands, empty

hand/compliance techniques, impact weapons, or just shutting the door or calling for back-up, were appropriate and a higher level of force was unnecessary.

163.    Based upon information and belief, when Defendant Greenwalt drew his firearm, no threat or reasonable suspicion to believe a threat to human life existed and no threat of immediate death or serious bodily injury existed.

164.    Based upon information and belief, when Defendant Greenwalt when drew his firearm, Decedent Berg was restrained and confined in custody and no threat existed for the use of deadly force.

165.    Based upon information and belief, when Defendant Greenwalt used deadly force and discharged his firearm at Decedent Berg, no immediate threat of death or serious bodily harm existed.

**COUNT I**
**42 U.S.C. § 1983 – Excessive Use of Force**

166.    The Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

167.    Defendant Greenwalt, while acting under the color of the law, violated Decedent Berg's constitutional rights by using excessive and unlawful deadly force on or about April 1, 2022, when he shot Decedent Berg eight times, with seven of the eight gunshot wounds occurring in the back or back-side of Decedent Berg, Decedent Berg was not an imminent threat.

168.    The actions of Defendant Greenwalt violated the constitutional rights guaranteed to Decedent Berg by the Fourth Amendment to the United States Constitution.

169.    The physical evidence does not support Defendant Greenwalt's claims to justify the use of deadly force at the moment Defendant Greenwalt's shot Decedent Berg.

170.    At the moment Defendant Greenwalt shot Decedent Berg eight times, no reasonable police officer would have believed an imminent threat existed.

171.    Defendant Greenwalt's actions were not taken in good-faith and were in violation of clearly established law.

172.    Defendant Greenwalt violated the GCSD Use of Force Policy in multiple ways when he unreasonably and unlawfully shot Decedent Berg, including, but not limited to, using deadly force when it is not authorized in accordance with the GCSD Use of Force Policy.

173.    As a direct and proximate result of Defendant Greenwalt's unreasonable and unlawful actions, Decedent Berg died and suffered substantial damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, pain, and suffering

174.    Because Defendant Greenwalt's actions were "motivated by evil motive or intent and/or involved a reckless or callous indifference to the federal protected rights" of Decedent Berg, an award of punitive damages is appropriate to the fullest extent permitted by law. *See Morning v. Dillon Cty.*, 2018 U.S. Dist. LEXIS at *12 (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)).

**COUNT II**
**42 U.S.C. §1983 –*Monell*[15] Liability – Grant County Commission**

175.    The Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

176.    The Grant County Sheriff's Department is the law enforcement agency  for Defendant Grant County Commission.

---

[15] *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978).

177.    The Sheriff of the Grant County Sheriff's Department is the "policymaker" with respect to county law enforcement. *See Revene v. Charles County Comm'rs,* 882 F.2d 870,874 (4th Cir. 1989).

178.    Defendant Grant County Commission, through its law enforcement agency, the Grant County Sheriff's Department, and its policymaker(s), developed and maintained the Prisoner Transportation Operational Policy, Guidelines on Deployment and Proper Protocols on the X-2 Taser, and Use of Force Policy. *See* Exhibits B, C, and D.

179.    As previously stated, the Grant County Sheriff's Department's Prisoner Transportation Operational Policy prohibits transportation of prisoners while handcuffed in front except in certain limited circumstances.

180.    As previously stated, the Grant County Sheriff's Department's Guidelines on Deployment and Proper Protocols on the X-2 Taser prohibits the use of a taser on a handcuffed individual exhibiting assaultive behavior that can reasonably dealt with in any other less intrusive fashion.

181.    As previously stated, the Grant County Sheriff's Department's Use of Force Policy prohibits the use of the X-2 taser where lesser levels of force are effective or appropriate.

182.    As previously stated, the Grant County Sheriff's Department's Use of Force Policy states that a deputy's escalation of force is restricted to only that which is required to properly respond to the particular circumstances of each situation.

183.    The Grant County Sheriff's Department's Use of Force Policy prohibits the drawing or displaying of a firearm unless there is a threat or reasonable suspicion of a threat to human life.

184.    The Grant County Sheriff's Department's Use of Force Policy states that deputies will only use deadly force in defense of the deputy or another person from what is reasonably believed to be an imminent threat of death or serious bodily harm.

185.    As stated throughout, Defendant Greenwalt repeatedly violated the Grant County Sheriff's Department's policies, including its Prisoner Transportation Operational Policy, Guidelines on Deployment and Proper Protocols on the X-2 Taser, and Use of Force Policy.

186.    The Grant County Sheriff's Department failed to train its deputies on its Prisoner Transportation Operational Policy, Guidelines on Deployment and Proper Protocols on the X-2 Taser, and Use of Force Policy.

187.    On March 31, 2022, and April 1, 2022, Defendant Greenwalt transported Decedent Berg in violation of the Grant County Sheriff's Department's policy.

188.    On April 1, 2022, Defendant Greenwalt used unlawful and unprovoked less than lethal force and deadly force against Decedent Berg in violation of the Grant County Sheriff's Department's policies.

189.    The Grant County Sheriff's Department's failure to train its deputies on its Prisoner Transportation Operational Policy, Guidelines on Deployment and Proper Protocols on the X-2 Taser, and Use of Force Policy caused Decedent Berg to be unlawfully shot eight times on the side road resulting in his death.

## COUNT III
## State Constitutional Violations

190.    The Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

191.    Defendant Greenwalt, while acting under the color of the law, violated Decedent Berg's West Virginia state constitutional rights by using excessive and unlawful force, as described herein, on or about April 1, 2022, which resulted in Decedent Berg's death.

192.    Count III alleges a constitutional tort action under the West Virginia Constitution, pursuant to the common law of West Virginia, and specifically is not filed pursuant to 42 U.S.C. § 1983 or any other related federal statute.

193.    The actions of Defendant Greenwalt were not taken in good-faith and were in violation of clearly established law.

194.    Defendant Greenwalt violated the GCSD Use of Force Policy in multiple ways when he unreasonably shot and killed Decedent Berg, including, but not limited to, using deadly force when it is not authorized in accordance with the GCSD Use of Force Policy.

195.    Defendant Greenwalt's actions were unnecessary, unreasonable, unlawful, and unjustified.

196.    As a direct and proximate result of Defendant Greenwalt's actions, Decedent Berg died and suffered substantial damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, pain, and suffering.

197.   The actions of Defendant Greenwalt against Decedent Berg were carried out with **(a)** actual malice and/or **(b)** a conscious, reckless, and outrageous indifference to the health, safety, and welfare of others, thereby justifying an award of punitive damages to the fullest extent permitted by law.

**COUNT IV**
**Wrongful Death - W.Va. Code§ 55-7-6**

198.   The Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

199.   As a direct and proximate result of the misconduct described herein, Defendant Greenwalt is responsible for Decedent Berg's wrongful death.

200.   As a direct and proximate result of Decedent Berg's wrongful death, the Estate of Jeremy D. Berg and Decedent Berg's family members are entitled to damages pursuant to West Virginia's Wrongful Death Statute, *West Virginia Code*, Section 55-7-6.

201.   The actions of Defendant Greenwalt against Decedent Berg were carried out with **(a)** actual malice and/or **(b)** a conscious, reckless, and outrageous indifference to the health, safety, and welfare of others, thereby justifying an award of punitive damages to the fullest extent permitted by law.

**COUNT V**
**Intentional Infliction of Emotional Distress**

202.   The Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

203.   Defendant Greenwalt shooting and killing Decedent Berg under the totality of circumstances in this case was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

204.    Defendant Greenwalt acted with the intent to inflict emotional distress or acted recklessly when it was certain or substantially certain that emotional distress would result from his outrageous conduct.

205.    Defendant Greenwalt's actions caused Decedent Berg to suffer severe emotional distress as he was being shot and killed.

206.    The emotional distress Decedent Berg experienced was so severe, no reasonable person could be expected to endure it.

207.    As a direct and proximate result of Decedent Berg's unreasonable and unlawful actions, Decedent Berg was shot eight separate times and suffered substantial damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, and physical pain and suffering.

208.    The actions of Defendant Greenwalt against Decedent Berg, including shooting Decedent Berg eight separate times, seven of which were from the back or backside, were carried out with **(a)** actual malicious and/or **(b)** a conscious, reckless, and outrageous indifference to the health, welfare, and safety of Decedent Berg and/or others, thereby justifying an award of punitive to the fullest extent of the law.

**COUNT VI**
**Spoliation of Evidence - Grant County Commission**

209.    The Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

210.    The Plaintiff, on April 22, 2022, timely requested the GCSD and Defendant GCC to preserve any and all evidence of the custody of Decedent Berg commencing in the evening hours of March 31, 2022, including video camera footage from the GCSD, Grant County Courthouse, and/or Grant County jail.

211.    The GCSD and Defendant GCC knew the Plaintiff timely requested the preservation of all video recording footage of the custody of Jeremy D. Berg commencing on March 31, 2022, and that such request was for the preservation of evidence for a pending or potential civil action.

212.    The GCSD and Defendant GCC knew the Grant County Courthouse Annex video surveillance cameras captured and recorded the custody of Decedent Berg from approximately 8:08 p.m. through approximately 11:46 p.m. on March 31, 2022.

213.    The GCSD and Defendant GCC knew the Grant County Courthouse Annex video surveillance cameras stored video recording for only a period of time and then recorded over the prior recordings on the hard drive.

214.    The GCSD and Defendant GCC knowingly, wantonly, and intentionally failed to preserve all video recordings of the custody of Decedent Berg from approximately 8:08 p.m. through approximately 11:46 p.m. on March 31, 2022.

215.    The evidence destroyed by the GCSD and Defendant GCC was of vital importance to the Plaintiff's causes of action in this civil action.  For all times Defendant Greenwalt claims Decedent Berg acted out while in custody, the video recording from the Grant County Courthouse Annex was not preserved.

216.    The failure of GCSD and Defendant GCC to preserve all video recordings, as set forth above, was intended to defeat the Plaintiff's ability to prevail in this civil action.

217.    As a direct and proximate result, the Plaintiff has suffered damages and will continue to suffer damages in the pendency in this action as the failure of the GCSD and Defendant GCC to properly preserve the video evidence will impede the Plaintiff's prosecution of this case.

**WHEREFORE**, the Plaintiff, Ernest Berg, in his capacity as the Administrator and Personal Representative of the Estate of Jeremy D. Berg, demands judgment against the Defendants for:

A. Compensatory damages for all economic losses and expenses incurred a result of the death of Jeremy D. Berg;

B. General damages for all physical pain, mental suffering, and emotional distress suffered by Jeremy D. Berg from the time of being shot until his death;

C. Spoilation of Evidence Damages;

D. Damages permitted to be recovered by the West Virginia Wrongful Death Act, including:

    i. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the Decedent;

    ii. Compensation for reasonable expected loss of (a) income of the Decedent, and (b) services, protection, care and assistance provided by the Decedent; and

    iii. Reasonable funeral expenses and any other expenses incurred as a result of the death of Jeremy D. Berg;

E. Punitive damages to the fullest extent permitted by law;

F. Pre-judgment and post-judgment interest;

G. Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988; and

H.  Such other further specific and general relief as may become apparent from

discovery as this matter matures for trial.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS.**


**ERNEST BERG, in his capacity
As the ADMINISTRATOR and
PERSONAL REPRESENTATIVE of the
ESTATE OF JEREMY D. BERG,
By Counsel**


*/s/ J. Bryan Edwards*
J. Bryan Edwards, Esq. (WV Bar No. 6886)
CRANSTON & EDWARDS, PLLC
1200 Dorsey Ave., Suite II
Morgantown, WV 26501
Tel: (304) 296-3500
Fax: (304) 296-3600
beedwards@cranstonedwards.com
*Counsel for Plaintiff*


*/s/ Traci M. Cook*
Kelly R. Reed, Esq., (WV Bar No. 6656)
Traci M. Cook, Esq., (WV Bar No. 7147)
LAW OFFICES OF KELLY R. REED PLLC
3118 Grafton Road
Morgantown, WV 26508
Tel: (304) 292-2020
Fax: (304) 292-2110
reed@kellyreedlaw.com
cook@kellyreedlaw.com
*Counsel for Plaintiff*